EXHIBIT 2

Mr. Kyle T. Nayback, Asst. U.S. Atty.
District of New Mexico United States Attorney's Office
P.O. Box 607
Albuquerque, NM 87103
June 11, 2015

Re:  US v Viarrial 15CR00214MV, my file C15-4002

Dear Mr. Nayback:

    Our initial contact was by email on 3/9/2015.  A complete list of contacts follows:

3/9/15 Initial email contact requesting approval for consult.
4/28/15 five emails dated over the interval since 3/9/15 all related to contracting with your office, with subsequent issue of DJJ15WUSA51-0046 with approval to bill for case review.
4/28/15 Received via mail your cover letter dated 4/15/15 and two CD discs
    "US v Gerald Viarrial Discovery 1-324"
    "US v Viarrial Wanda Quintana 2-6-15 interview 15-0045, Bates 210+312"
4/28/15 After review of discs, I called you and we discussed a re-interview of victim Ricky Viarrial who was age 15 at time of alleged assault
6/3/15 Received email from Mr. Nayback with Word doc attachment 2 page BIA interview by agent Montowine of Ricky Viarrial dated 5/15/15
6/11/15 You called and requested this report.

Disc "Discovery 1-324, " pdf file "redacted 1-193" about 123MB total:

    Pages 17-21: Pueblo of Pojoaque Tribal Police Det. Johnson incident report pertaining to interview conducted 3/26/14 by Ms. Trujillo at SafeHouse of victim, RV: On page 19 Det. Johnson states that Ricky made direct statements about prior instances of death threats from the defendant and specific threats with a gun. This interview has no information about a strangulation incident. Quotation is from Det. Johnson's report, not the actual words of the witness.

    Page 21: Pueblo of Pojoaque Tribal Police Det. Johnson incident report pertaining to interview conducted 3/26/14 by Ms. Trujillo at SafeHouse of witness (sibling) "J."  Det. Johnson describes the witness statement as, "on one occasion his dad choked R with his hands" and added that a handgun was present when that assault occurred.  Quotation is from Det. Johnson's report, not the actual words of the witness.

    Page 22-23: Pueblo of Pojoaque Tribal Police Det. Johnson incident report pertaining to interview conducted 3/26/14 by Ms. Trujillo at SafeHouse of witness (sibling) "E" or "B," (not sure from the redacted report). Per Det. Johnson this witness stated that they witnessed the strangulation assault and it occurred on Monday, March 24.

**Page 45: BIA Agent Montowine "Memorandum of Interview" dated 3/28/14 pertaining to having witnessed an interview conducted by Det. Johnson in the Tribal Police Dept. office of the victim (victim name is completely redacted, but context of interview implies it is with RV), Agent Montowine writes that the victim stated "…his dad started choking him with his hand…" He further stated, "*victim* was choked to the point he could not breathe." The detective added that the demeanor of the victim indicated need for a forensic interview at SafeHouse. Quotations are words in the agent's Memorandum report that the agent attributed to the witness.**

Page 54: BIA Agent Montowine "Memorandum of Interview" dated 4/7/14 pertaining to having witnessed an interview conducted at the Solace Center office by Ms. Candelaria of a sibling witness, name completely redacted from report but evidently a male sibling of the victim. This witness could be the same "E" or "B" reported in the interview by Ms. Trujillo, but it may also be a different child. This child states that he witnessed the strangulation assault on Ricky, "he had once seen his dad choking his brother and there was a gun on the bed." Further, "*child* said his dad choked *victim* with his hands."

Page 61: BIA Agent Montowine "Memorandum of Interview" dated 4/7/14 pertaining to having witnessed an interview conducted at the Solace Center office by Ms. Candelaria of a sibling witness, name completely redacted from report but evidently a female sibling of the victim. This person also witnessed the strangulation assault. Per Agent Montowine, "she said he choked *victim* on Monday the 23rd."

Page 76: Pueblo of Pojoaque Tribal Police Det. Johnson incident report with a date of incident as 3/26/14 but within the narrative a statement that the interview actually was 3/28/14 in the Police Dept. Office after a spontaneous and evidently coincidental contact with one of the sibling children who happened to be at the Police Dept. with cleaning lady Ms. Wanda Quintana (mother of victim and other children). Det. Johnson describes taking the child to an interview room on 3/28/14. The name of this witness is redacted but it appears to be a male sibling of the victim. Det. Johnson then reports that this witness stated, "*defendant* grabbed *victim* by the throat, pushed him up against the wall and started choking him…that his dad then reared back with the other hand as if he was going to punch *victim* in the face."

<u>Disc "Discovery 1-324, " pdf file "redacted 194-324" about 60MB total:</u>

pp. 27-28: Pueblo of Pojoaque Tribal Police Det. B. Bryant incident report dated 3/26/14 but describing the interview conducted by Ms. Candelaria at Solace Center on 4/2/14 of Estaphanita Viarrial (name is not redacted) and this may be the same individual who was cited on pages 22-23 of the first pdf file as "E" or "B" (from that record I cannot tell which letter of the alphabet is used to indicate the witness name due to the overlap of the redaction marks) as having been interviewed by Ms. Trujillo at SafeHouse on 3/24/14. Officer Bryant reported, "When asked if she had ever seen her dad choke anyone, she said that her dad choked Ricky on Monday the 24th of March because he thought Ricky had told someone what had been going on at the house. She went on to say that her dad had him around the throat and kept threatening to punch him in the face. He told them all that they would all end up in jail and they would end up being raped in jail."

Disc "US v Viarrial Wanda Quintana 2-6-15 interview 15-0045, Bates 210+312"

This disc contains audio recording files of interviews, about 13 separate files, of witnesses in this case, and jail calls

Written report of Agent Montowine dated 5/15/15 of interview with Ricky Viarrial (victim):

On 4/28/15 in a telephone conversation with AUSA Mr. Nayback, I asked him if he could perhaps have the investigators re-interview Rick Viarrial to see if he could add any details that might have medical implications about the strangulation assault. On 6/3/15 Mr. Nayback sent me an email with an attached Word document that is a 2 page report dated 5/15/15 by Agent Montowine concerning an interview with Ricky Viarrial at the Northern Pueblos Agency.

> **"I asked Ricky about the statements he made during previous interviews in reference to his father (Viarrial) strangling him during a particular assault. I asked Ricky to demonstrate how his father strangled him. Ricky put his right hand to his throat in a cupped position. Ricky explained to me, as he was being strangled, his dad was holding his free hand in the air with a closed fist as if he was going to punch him.**
>
> **Ricky said he was scared for his life and thought he was going to die from the strangulation. Ricky said the strangulation did not hurt, however he suggested the event was scary and he might not of felt the pain because of everything going on.**
>
> **Ricky spoke in a low voice and it was difficult to understand him. Ricky was scarred and nervous during the interview. I asked Ricky about certain symptoms associated with being strangled such as losing consciousness, being dizzy, or even defecating on himself. Ricky said none of that occurred.**
>
> **I reminded Ricky he gave statements to the tribal police indicating he had these symptoms on a previous interview. Ricky said the event happened so long ago, it was difficult to remember."**

I have discussed this case with Asst. U.S. Atty. Nayback during phone conversations as specified above. I have not discussed the case with the investigators and I have had no contact with the investigators or witnesses.

---

From only the above cited evidence materials, I have come to certain opinions. It is my opinion that Ricky Viarrial did sustain a manual strangulation assault. It is my opinion that his symptoms, "he could not breathe" (attributed to Agent Montowine, page 45 of 1-194 file, during interview with RV on 3/28/14) and that "he thought he was going to die" (attributed to Agent Montowine, interview of 5/15/15) are typical of a serious, life threatening strangulation assault.

In my opinion, failure to remember specifics about pain and other symptoms is typical of serious strangulation assault, where there is significant fear of death.

Pressure on the neck, of such force that there is actual obstruction of breathing, is a force also great enough to interrupt blood flow to the brain, even arterial flow through the carotid arteries.  This much force poses a significant risk of death.  The amount of force needed to close off the airway is more force that necessary to close off the blood flow through the jugular veins, and the carotid arteries, effectively eliminating blood flow to the brain.  In a study of life-threatening and non-life threatening strangulation assault, Christe, et all reported that 9 of 25 survivors who reported "dyspnea" (difficulty breathing) sustained internal hemorrhages in the neck that correlate with life-threatening injury.  In concluding that difficulty breathing during strangulation implicates a "very dangerous" and "may lead to death" type of assault, Green reports the following conclusions about force and compromise of airflow during strangulation assault:

> **Specific Functional Changes in Strangulation**
> Functional changes in a strangulation case may include damage to the voice box (larynx) and/or the hyoid bone. (*Note*: The hyoid bone is the only bone in the body that is not directly connected to any other bone; it aids in tongue movement and swallowing.) Bruising (contusion) and bleeding (hemorrhage) are common in strangulation cases, as well as swelling (edema). Swelling is something that should be of grave concern given that it may not be apparent until hours after the strangulation occurs. These findings may develop with as little as 22 pounds of pressure to the neck. The temporary blockage or closing of the blood vessels (occlusion) requires 33 pounds of pressure, and fracture of the hyoid bone requires 35–46 pounds of pressure.
>
> Various combinations of functional changes may occur, leading to severe trauma to the upper airway. For example, the airflow can be compromised, the voice box fractured, and facial and neck swelling can be evident. Air can escape from the air passages and leak into the soft tissues (subcutaneous emphysema). These injuries can be very dangerous to a patient and may lead to death.

My understanding of the pathophysiology of strangulation assault, including my understanding of signs and symptoms expressed by surviving victims, is reflected in scientific literature and my own published peer-reviewed research.  A partial list of citations, including those specified above, and others related directly to evidence in this case is appended.

## REFERENCES

Strack GB, Gwinn C, Hawley D, Green W, Smock B, Riviello R: Why didn't someone tell me? Health consequences of strangulation assaults for survivors. Domestic Violence Report 19(No. 6): 81-100, Aug/Sept 2014, ISSN 1086-1270, Civic Research Institute.

Strack GB, McClane G, Hawley DA: A review of 300 attempted strangulation cases Part I: Criminal legal issues. Journal of Emergency Medicine 21(3):303-9, Oct 2001

Taliaferro E, Hawley D, McClane G, and Strack G: "Chapt 16. Strangulation in Intimate Partner Violence." In, Intimate Partner Violence: A Health-based Perspective. Edited by Connie Mitchell and Deirdre Anglin, Oxford University Press, 2009

McClane G, Strack GB, Hawley DA: A review of 300 attempted strangulation cases Part II: Non-fatal assaults. Journal of Emergency Medicine 21(3):311-5, Oct 2001

Glass N, Laughon K, Campbell J, Block CB, Hanson G, Sharps PW, Taliaferro E: Non-fatal strangulation is an important risk factor for homicide of women. Violence: Recognition, Management and Prevention 35(No,. 3): 329-335, 2008.

Hawley DA: Chapt. 8: Death by strangulation. In The Investigation and Prosecution of Strangulation Cases. Training Institute on Strangulation Prevention and California District Attorneys Association, funded by a grant from US Dept of Justice Office on Violence against Women, 2013, accessed at http://familyjusticecenter.org.

Christe A, Thoeny H, Ross S, et al: Life-threatening versus non-life –threatening manual strangulation: are there appropriate criteria for MR imaging of the neck? Eur Radiol 19: 1882-1889, 2009.

Green W: Chapt. 5: Medical evidence in non-fatal strangulation cases. In The Investigation and Prosecution of Strangulation Cases. Training Institute on Strangulation Prevention and California District Attorneys Association, funded by a grant from US Dept of Justice Office on Violence against Women, 2013, accessed at http://familyjusticecenter.org.

Hawley DA, McClane G, Strack GB: A review of 300 attempted strangulation cases Part III: Injuries in fatal cases. Journal of Emergency Medicine 21(3):317-22, Oct 2001

Sincerely,

Dean A. Hawley, M.D.
Forensic Pathologist
Tenured Professor of Pathology
Director of Autopsy Services
Dept. of Pathology and Laboratory Medicine
Indiana University School of Medicine

350 W. 11th St., IUHPL Bldg. Rm. 4064
Indianapolis, IN 46202
Voice: 317-491-6000
Fax: 317-491-6419
Email: dhawley@iupui.edu