# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

GERALD VIARRIAL,

        Defendant.

No. 15-CR-0214-MV-001

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Gerald Viarrial's

Motion to Suppress Evidence and Memorandum in Support [Doc. 22] and Motion to

Suppress Statements and Evidence and Memorandum in Support (Second Motion)

[Doc. 23]. The government timely responded to each motion [Docs. 26-27] and

Defendant replied to each response [Doc. 30-31]. A consolidated hearing on the

Motions was held on September 16, 2015 in Santa Fe. The Court, having

considered the Motions, briefs, hearing testimony, exhibits, relevant law, and being

otherwise fully informed, finds that the Motions are not well-taken and will be

**DENIED.**

## BACKGROUND

On March 23, 2014, one of Gerald Viarrial's children approached Elizabeth

Duran, "the director of the Social Services Department for the Pueblo of Pojoaque"

to report that his father had been physically abusive to him and his siblings. Hearing Transcript[1] ("Tr.") at 10-11. Duran then contacted Chief Frank Rael of the Pueblo of Pojoaque Tribal Police Department ("PTPD") to inform him of the allegations that the child had made to her, including that Viarrial had been physically abusive toward his children. *See* Tr. at 11. *See also* Doc. 26 at 1 ("one of Defendant Gerald Viarrial's children, known for the purposes of these proceedings as 'John Doe 2' informed law enforcement officials that 'Defendant is physically and emotionally abusive toward John Doe 2 and his other [sic] siblings.'").

According to this child, Viarrial was "always threatening to have people kill them [Viarrial's children] for no reason" and was frequently physically abusive, including an incident in which he "grabbed John Doe 1 [another of Viarrial's children] by the throat, pushed him up against the wall and started choking him." Doc. 26 at 1. *See also* Tr. at 10-12, 53 ("Threats to kill; threats to have a shootout with the police by Mr. Viarrial; threats of abuse in one case; and allegations of strangulation."). In an apparent effort to deter his children from reporting this violent conduct to the relevant authorities, Viarrial warned Doe 2 "that if [Doe 2] ever brings the Cops [sic] in, he [Viarrial] will have another shootout with the police and this time he will get all of them instead of just one . . . and that it would be [John Doe 2's] fault." Doc. 26 at 1 (internal quotation marks omitted). Doe 2 also

---

[1]     Citations to the Hearing Transcript refer to a rough draft of the transcript from the September 16, 2015 hearing prepared for the Court by its court reporter. Quotations and citations, therefore, should not be understood to be precise, verbatim accounts, but rather sufficiently close approximations that suffice for the purposes of this Memorandum Opinion and Order.

informed the police that his father possessed a black handgun, rendering these threats at once more horrific and credible. *Id.* *See also* Tr. at 11-12 (noting that there were "threats made with the presence of firearms.").

An interview with Doe 1 confirmed Doe 2's story. Doe 1, "the Defendant's oldest son" was visibly shaken during the conversation and explained that his father had "told him that if he tells anyone what he does, he would kill them [his sons]" emphasizing that "his dad began choking him with his hand and told him, this is what they will do to you in jail and they will start raping you." *Id.* 1-2. Evidently, this pattern of behavior was not uncommon; Doe 1 stated that his father "is always threatening them and says that he will kill them." *Id.* at 2. Further, Doe 1 also reported that he "had seen rifles and a handgun at his Dad's Old Pueblito Road house and had also seen guns at his other house in plain view." *Id.* Doe 1 apparently left the interview abruptly out of fear that his father would learn that he was speaking to police. *See id.*

On March 28th, Defendant was arrested at "The Sopapilla Factory Restaurant" in the Pueblo of Pojoaque; at that time, he was informed of the child abuse allegations against him, but he did not visibly react. Tr. at 12. *See also* Doc. 22 ¶ 2. Defendant was immediately "taken to tribal police headquarters" which is "about one block" away from the Sopapilla Factory. Tr. at 12-13. During his arrest and transport to the station, no officers questioned Viarrial or otherwise engaged him in conversation. *Id.* at 24-25. Once at tribal police headquarters, Defendant

was properly informed of his *Miranda* rights, at which point he indicated that he understood those rights and then elected not to make a statement to the officers. *Id.* at 13, 15. *See also id* at 26. Notwithstanding this invocation of his rights, Defendant then said, unprompted, "if you want to treat me like a criminal, I will be one, you will see." *Id.* at 14. He also eventually volunteered that he had caught his sons "ditching" and that "Wanda coached" his children in an apparent attempt to explain his children's statements. *Id.* at 19-20.

Sometime later, officers requested Defendant's permission to "search [Viarrial's] property for weapons." *Id.* at 14. Upon receiving Defendant's agreement, the PTPD produced two "Consent to Search" forms and then-Corporal Jon López meticulously explained the documents "step by step" to ensure that Viarrial appreciated the meaning and significance of their contents. *Id.* at 26-28. After this discussion, Defendant consented to a search of his properties and signed the two separate "Consent to Search" forms prepared by the PTPD; one form described a domicile located on Old Pueblito Road and the other listed three separate vehicles located at "Rt 1 Box 55" in Santa Fe. Tr. at 14-15. *See also* Gov. Ex. 3-4; Tr. at 36. Importantly, however, neither form mentioned Defendant's second residence, located on Lightning Loop. Tr. at 40.

Corporal López "then transported [Viarrial] to the Old Pueblito address first to begin the search," which revealed no incriminating evidence. *Id.* at 29. Corporal López then "put [Viarrial] back in [his] patrol car and then [he] transported

[Viarrial] to the Lightning Loop address." *Id.* at 30. During the drive to the second

residence, Viarrial initiated a conversation, telling Corporal López that there was a

.45 caliber pistol "in a heater box in the living room." *Id.* In response, Corporal

López inquired "if there was any other contraband" of which the police should be

aware; Viarrial replied that there was "a pot pipe in the coffee table in the living

room." *Id.* at 30-31. *See also* Doc. 22 ¶ 3 (noting that Viarrial mentioned that a "'45'

[caliber pistol] was within a heater box in the living room of his second residence").

Upon arrival at the second residence, Viarrial "was escorted up to" the door, which

he opened for the officers. Tr. at 32. *See also id.* at 47 ("Viarrial actually opened

the door for us."). However, when police ultimately located the "heater box" that

Viarrial had described to Corporal López, Viarrial "stepped in and said that we

cannot touch that, that that was religious items." *Id.* at 33. *See also* Doc. 26 at 2;

Doc. 22 ¶ 4. Sergeant Bryant of the PTPD, also present at the scene, then informed

Viarrial that the officers would "take custody" of the heater box and the Sentry-

brand safe within it. Tr. at 33. Sergeant Bryant continued that in order to "respect

[Viarrial's] wishes, [the police] would have the war chief" from the Pueblo "present

and actually open the box for us so that we would not disrespect any religious

items." *Id.* Consistent with Viarrial's earlier statement, the search also revealed "a

metal marijuana pipe with burnt residue on it within the coffee table." *Id.*

"On March 31, 2014 PTPD Lieutenant Eric Johnson" swore an affidavit in

support of a search warrant for the "Sentry security fire protected safe, black in

color with a key lock on the door of the safe." Id. ¶ 5. (internal quotation marks omitted). *See also* Tr. at 62. While the warrant and attached affidavit make patent that the subjects of the search are firearms and ammunition, there is no mention of to which crime, if any, the officers believed any such weapons were connected or why the officers believed the weapons were contraband. S*ee generally* Doc. 22-1. *See also* Doc. 22 ¶ 8; Tr. at 73-75. The government urges, however, that "Lieutenant Eric Johnson of the Pojoaque Tribal Police Department briefed the Pojoaque Tribal Court Judge on the facts and allegations that formed the basis for the Criminal Complaint [also filed March 31, 2014] and Affidavit for Search Warrant." Doc. 26 at 3. *See also* Tr. at 60-62, 76-78. The tribal judge issued the warrant; officers found four firearms in the safe. *Id*.

Also on March 31, 2014, Viarrial "asked to be able to speak with PTPD Lt. Johnson" while awaiting arraignment in a PTPD police station. Doc. 23 ¶ 7. *See also* Tr. at 63 ("Viarrial had requested to speak with me"). Defendant told the lieutenant that he would "find guns in [the safe]" but insisted that the firearms belonged to his wife and offered to permit the officers to search the safe. Doc. 27 at 3. *See also* Tr. at 63 ("he just stated on his own that he would let us look into the box that we had taken on that previous Friday. And he stated that there were guns in there that belonged to his ex-wife."). Viarrial also repeated his assertion that "his boys were doing this to him because he caught them ditching school." Doc. 23 ¶ 7. *See also* Tr. at 63 ("He had stated that the reason this whole thing was

happening was because he caught his boys skipping school, or something to that effect.").

Defendant now seeks to suppress both the physical evidence obtained from the safe and of his statements made to the police, including his confessions "that the safe contained religious items and they could not touch them; and that his boys were doing this to him because he caught them ditching school; and that there were guns inside the box that belonged to [Jane Doe]." Doc. 27 at 3. The government responds that both the physical evidence and the statements were lawfully obtained. The Court agrees.

## DISCUSSION

I.  **Consent Searches**

a.  *Relevant Law*

It is by now black-letter law that "[c]onsent is an exception to the Fourth Amendment's warrant requirement for a search of a residence." *United States v. Romero*, 749 F.3d 900, 905 (10th Cir. 2014). See also *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) ("a search authorized by consent is wholly valid."). Thus, "[w]hen an individual consents to a police search, and the consent is 'freely and voluntarily given,' the search does not implicate the Fourth Amendment." *Reid v. Paulter*, 36 F. Supp. 3d 1067, 1161 (D.N.M. 2014) (Browning, J.). The Tenth Circuit has explained that, for these purposes, "voluntariness" is determined "under the totality of the circumstances" and that it employs "a two-part test to guide [its]

inquiry." *United States v. Sanchez*, 608 F.3d 685, 690 (10th Cir. 2010). This test requires that the prosecution: "(1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given, and (2) the officers must have used no implied or express duress or coercion." *Id.* (internal quotation marks omitted). Factors that may be relevant in this "totality of the circumstances" analysis include:

> (i) the threatening presence of several officers; (ii) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and [ ] tone of voice; (iii) the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure to advise the defendant that [he or] she is free to leave.

*United States v. Sedillo*, No. CR 08–1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J) (some alterations in original). Of course, no one factor is dispositive and the Court must assess the aggregate effect of the situation. Moreover, while consent must be unequivocal and specific, it need not be verbal and "may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *United States v. Guerrero*, 472 F.3d 784, 789-90 (10th Cir. 2007).

   b. *The Instant Case*

   After considering Defendant's arguments at the hearing, it is apparent that the sole question of consent before the Court is whether Viarrial effectively

8

consented to the search of his residence on Lightning Loop. That is, because no evidence was found in any of the locations described by the "Consent to Search" forms, the relevant inquiry for the suppression motions becomes whether the officers had permission to search Viarrial's Lightning Loop domicile. The Court finds that Viarrial appropriately consented to the search in question.

First, although the Lightning Loop residence was not described in either "Consent to Search" form, these documents figure prominently in the Court's analysis. Corporal López offered uncontroverted testimony that he carefully explained the contents of the documents to Viarrial, who then signed both of them to signify his understanding of their contents and his consent to search the locations described therein. *See, e.g.*, Tr. at 26-28. The documents themselves plainly indicate that Viarrial may "refuse a search" if he so desires and that he "may withdraw this consent and authority to search at any time." Gov. Ex. 4, 5. Further, the form requires the signatory to affirm that the "consent has been made by me without any threats" and that it "is freely and voluntarily given." *Id.* While this consent does not, of course, itself extend as far as the second residence, the documents are nonetheless crucial in that they, along with the attendant conversation with Corporal López, unequivocally informed Viarrial in unambiguous language of his right to refuse a search and that any consent he rendered must be "freely and voluntarily given." *Id.* Stated differently, these firms both apprised

Viarrial of his rights and worked to alleviate some of the coercion inherent in police interactions.

Second, once at the Lightning Loop address, Viarrial opened the door for the police officers and permitted them to enter his home on his own initiative. *See* Tr. at 47. At no point did Viarrial give any indication that he objected to PTPD officers entering the residence or that he was in any way uncomfortable with the situation. To the contrary, Viarrial had already advised Corporal López that there was a handgun in the heater box and a marijuana pipe in the coffee table, thus facilitating the officers' search and implying that the officers were free to enter the domicile. The act of opening the door for PTPD officers, when taken in concert with Viarrial's unsolicited statements regarding the location of relevant evidence, plainly constitute consent "granted through gestures or other indications of acquiescence." *Guerrero*, 472 F.3d at 789. *See also Reid v. Pautler*, 36 F. Supp. 3d 1067, 1165-66 (D.N.M. 2014) ("In *United States v. Gordon*, for example, the Tenth Circuit found implied consent when, in response to an officer's question whether the defendant could open a locked bag, the defendant handed the officer the key."); *United States v. Abu Zuhrieh*, -- F. Supp. 3d --, 2015 WL 5026119, at * (D.N.M. July 21, 2015) (explaining that defendant "unequivocally consented to a search of the suite [in part by] volunteering the key corresponding to that unit.").

Only after the heater box had been located did Viarrial object to the search for the first time, claiming that the case contained items of religious significance.

*See* Tr. at 59. However, by that time, Viarrial had already admitted to officers that the selfsame heater box contained at least one firearm. Contrary to Defendant's questioning at the suppression hearing, this fact alone furnished sufficient basis for the officers to secure the box. *See Ysasi v. Brown*, 3 F. Supp. 3d 1088, 1158 (D.N.M. 2014) ("once a person revokes the consent that permitted officers to enter the home or conduct a search, the officers should promptly leave, unless the officers have independent legal authority to remain."). That is, it is of no moment that "there's nothing illegal about Mr. Viarrial having a firearm in that heater box in his residence" and that "the Second Amendment does apply" on tribal land; the officers had probable cause to believe that the firearm was evidence in the child abuse investigation and therefore could secure the container for a reasonable period, pending the issuance of a warrant. *See, e.g.*, *United States v. Donnes*, 947 F.2d 1430, 1436 (10th Cir. 1991) ("Probable cause to believe that contraband is stored in a container will justify a warrantless seizure so that a law enforcement officer may preserve the potentially incriminating evidence for the period of time necessary to secure a warrant authorizing the search of the contain.").

Third and finally, there is no reason to believe that Viarrial's nonverbal consent was coerced in this case. Although Viarrial was in custody and in the presence of several officers, any coercion inherent in these circumstances is outweighed by the fact that Defendant had received a thorough explanation of his right to refuse, had previously consented to the search of his other residence and his

vehicles, and had, on his own initiative, informed the officers of various locations within the Lightning Loop domicile that contained items of interest. Thus, given that Defendant had previously signed two Consent to Search forms, helped officers open the door and locate the heater box, and does not appear to have been coerced, it is apparent that Viarrial effectively consented to the search of the Lighting Loop home and that, therefore, the fruits of this search need not be suppressed.

## II.    Warrant Searches

### a. *Relevant Law*

The Fourth Amendment specifically demands that a "search warrant can issue only upon a showing of probable cause." *United States v. Long*, 774 F.3d 653, 658 (10th Cir. 2014). *See also* U.S. CONST. AMEND. IV ("…and no warrants shall issue, but upon probable cause…"). In order to satisfy this requirement, a "supporting affidavit must provide a substantial basis to conclude that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. (internal quotation marks omitted). That is, when "assessing probable cause, we look to the totality of the circumstances as detailed in the affidavit accompanying the application for the search warrant." *United States v. Pulliam*, 748 F.3d 967, 971 (10th Cir. 2014). In doing so, the magistrate is entitled to "draw reasonable inferences from the material provided in the warrant application." *United States v. Rowland*, 145 F.3d 1194, 1205 (10th Cir. 1998).

A reviewing court is not empowered to re-litigate a magistrate's decision with the benefit of hindsight; instead, the court must "interpret search warrant affidavits in a common sense and realistic fashion" and "uphold the warrant as long as the issuing judge had a substantial basis for ... conclud[ing] that a search would uncover evidence of wrongdoing." *United States v. Grimmett*, 439 F.3d 1263, 1270 (10th Cir. 2006) (internal quotation marks omitted). *See also United States v. Reed*, 195 F. App'x 815, 821 (10th Cir. 2006) ("A reviewing court should accord great deference to a magistrate's determination of probable cause."). Even so, the "deference accorded a magistrate judge's probable cause determination, however, is not boundless" and is not justified where the "probable-cause determination ... is a mere ratification of the bare conclusions or hunches of others or where it involves an improper analysis of the totality of the circumstances." *Ysasi*, 3 F. Supp. at 1141 (internal quotation marks omitted).

However, not all evidence obtained from a technically deficient warrant must be suppressed. Under the good-faith exception to the exclusionary rule, "[i]f a warrant is not supported by probable cause, the evidence seized pursuant to the warrant need not be suppressed if the executing officer acted with an objective good-faith belief that the warrant was properly issued by a neutral magistrate." *United States v. Campbell*, 603 F.3d 1218, 1225 (10th Cir. 2010) (internal quotation marks omitted). Moreover, an "executing officer is generally presumed to be acting in good-faith reliance upon a warrant." *United States v. Gonzales*, 399 F.3d 1225, 1231

(10th Cir. 2005). The Tenth Circuit, however, has recognized limits to the good-faith exception, noting that it is "not absolute" and delineating circumstances in which it does not apply:

> There are four situations in which the presumption of good faith and, consequently, the good-faith exception to the exclusionary rule do not apply: (1) when the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his reckless disregard of the truth; (2) when the issuing magistrate wholly abandon[s her] judicial role; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid."

*Gonzales,* 399 F.3d at 1231. In aggregate then, the law demands that the Court not interrogate intensively the probable cause decision of the issuing magistrate and accord lenity to officers who, in good faith, rely on a facially valid warrant, except in the four instances described above.

b. *The Instant Case*

Defendant argues that the search warrant issued by the tribal court judge did not have a "substantial basis" for probable cause and that, therefore, all fruits of that search must be suppressed. To this end, Viarrial relies on a relatively technical argument: that because neither the warrant nor the attached affidavit specified that the firearms and/or ammunition allegedly contained in the safe had been connected to any criminal activity, the warrant was invalid. Doc. 22 at 7. That is, because there is no mention of any criminal activity within the "four corners" of the warrant and incorporated affidavit, Viarrial contends that there can

14

be no probable cause to support the search. This argument misapprehends the governing law. In effect, it appears that counsel misunderstands the applicability of the "four corners doctrine" articulated in *Franks v. Delaware* and therefore believes that a magistrate may consider only that information contained in a supporting affidavit, rather than oral testimony or other support offered by officers. *See, e.g.*, Doc. 22 at 6-8. This view is incorrect.

The rule in the Tenth Circuit is more accurately stated as: "where the police do not present oral testimony to the reviewing magistrate, the appellate court must ascertain the existence of probable cause to support a warrant exclusively from the affidavit's four corners." *United States v. Beck*, 139 F. App'x 950, 954 (10th Cir. 2005) (emphasis added). *See also United States v. Guerrero*, No. 07–40156–01–SAC, 2008 WL 2549010, at *3 (D. Kan. June 24, 2008) ("If the judge only considered a supporting affidavit in issuing the warrant, the reviewing court likewise determines the existence of probable cause for the warrant exclusively from the supporting affidavit's four corners."). This understanding of the doctrine finds ample support in the decisions of courts outside of this circuit. *See, e.g., United States v. Cole*, 569 F.3d 391, 392-93 (8th Cir. 2009) ("Defendant acknowledges our court has repeatedly held the Fourth Amendment does not require the issuing judge to record sworn supplementary oral testimony."); *United States v. Parker*, 72 F. App'x 358, 360 (6th Cir. 2003) ("The district court also properly concluded that the issuing judge was authorized to consider Weber's oral testimony. Under federal law, the issuing

magistrate judge may take into account oral information provided by the affiant as long as it is provided under oath."); *Frazier v. Roberts*, 441 F.2d 1224, 1226 (8th Cir. 1971) ("It is clear that the Fourth Amendment permits the warrant-issuing magistrate to consider sworn oral testimony supplementing a duly executed affidavit to determine whether there is probable cause upon which to issue a search warrant.").

Here, Corporal López was put under oath "at the time of actually obtaining the search warrant" from the tribal judge. Tr. at 78. Unfortunately, however, although this Court presumes that Corporal López's testimony was sufficient to cure any deficiency in the Affidavit for Search Warrant, the Court cannot rely on such an assumption. Consequently, the Court agrees that the affidavit does not establish probable cause and that, therefore, the warrant issued improperly. Nonetheless, the Court will not suppress the fruits of this search for two independent reasons: (1) the officers relied on the warrant in good faith and (2) Defendant consented to the search of the safe. The Court will address each rationale in turn.

First, the warrant and accompanying affidavit both bear the docket number of the corresponding criminal case, in which the Criminal Complaint and Statement of Probable Cause had already been submitted. Both the Criminal Complaint and Statement of Probable Cause are sworn documents that clearly establish probable cause to issue the warrant. The defect in this case, then, was the PTPD's failure to

incorporate those documents into, or physically affix them to, the affidavit. However, given that all the relevant documents bore the same case number and that Criminal Complaint and Statement of Probable Cause had been sent to the tribal court judge earlier the same day as application for the warrant, it was reasonable for the officers to believe that the affidavit would be understood in the context of the broader criminal case. Tr. at 57 ("the paperwork [including the criminal complaint and statement of probable cause] were sent to the judge first thing on Monday morning, which was the 31st."). *See also id.* at 74 ("Like I stated before, the judge had been briefed on everything that was going on, and she had already received a detailed criminal complaint and statement of probable cause by this time."). On these facts, this Court cannot find that the tribal judge "wholly abandon[ed] [her] judicial role," nor that "the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Gonzales* 399 F.3d at 1231. Plainly, the PTPD should have been more conscientious in preparing the documents in support of the warrant, but under the circumstances, it was not unreasonable for the officers to expect that the sworn documents, linked by a shared docket number, would be read as part of the same parcel of information. To hold otherwise in this case would, in effect, demand suppression of evidence for want of a paperclip.

Second, Viarrial consented to the search of the safe, even though the PTPD ultimately did not purport to rely on this permission. Specifically, Viarrial

requested to speak to Lieutenant Johnson before he was arraigned in tribal court and, "stated on his own that he would let us look into the box" containing the safe. Tr. at 63. *See also* Doc. 80 ("he gave verbal consent to look in the box at that time."). There can be no argument that this *sua sponte* consent, which required Viarrial to request Lieutenant Johnson's presence, was either coerced or not voluntary. Such consent obviates entirely the need for a warrant and is fatal to Defendant's request for suppression. *See, e.g.*, *Reid*, 36 F. Supp. 3d at 1161 (D.N.M. 2014) ("[w]hen an individual consents to a police search, and the consent is 'freely and voluntarily given,' the search does not implicate the Fourth Amendment.").

## III.    The Custodial Interrogation and *Miranda*

a. *Relevant Law*

"Under Miranda, law enforcement officers must advise a suspect who is subjected to custodial interrogation that he has the right to remain silent, that statements can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed." *United States v. McCluskey*, 893 F. Supp. 2d 1117, 1138 (D.N.M. 2012). *See also Missouri v. Seibert*, 542 U.S. 600, 608 (2004) ("failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained."). Any "waiver of one's Fifth Amendment privilege against self-incrimination must be made voluntarily, knowingly and intelligently." *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008) (internal quotation marks omitted). "Whether this

standard is met depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.* The government bears the burden of proving an effective waiver by a preponderance of the evidence. *United States v. Morris*, 287 F.3d 985, 988 (10th Cir. 2002).

As with the requirements for consent described above, an "express statement of waiver is not required; the waiver can be inferred from the defendant's actions and words." *United States v. Christy*, 785 F. Supp. 2d 1004, 1027 (D.N.M. 2011). For a waiver to be valid, however, the Court must satisfy itself that it was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burson*, 531 F.3d at 1257. The Tenth Circuit has emphasized two features of this analysis:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Morris*, 287 F.3d at 988. If, however, a defendant wishes to invoke the right to remain silent or to the assistance of counsel, he must do so "unambiguously," rather than in a manner that is "ambiguous or equivocal." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). *See also United States v. Christy*, 785 F. Supp. 2d 1004, 1028

(D.N.M. 2011) ("To fall within the ambit of this rule, however, a defendant's invocation of his right to remain silent must be clear and unambiguous.").

    b. *The Instant Case*

Viarrial does not levy any serious argument that he was not properly apprised of his Fifth Amendment rights; instead, he merely asserts that the "government has the burden to show that the alleged incriminating statements allegedly made by Mr. Viarrial were voluntarily made by Mr. Viarrial." Doc. 23 at 7. Indeed, at the hearing held on the Motions, the Defense effectively conceded defeat, stating that the "evidence before the Court regarding *Miranda* rights, I do not have a basis to dispute" and that "based on the testimony today, I can't argue against that, with all honesty, as much as I would like to. But I cannot." Tr. at 100.

The testimony in this case leaves little room for doubt. It is uncontested that after the PTPD transported Viarrial to the stationhouse, Chief Rael properly advised Viarrial of his *Miranda* rights. *See, e.g.*, *id.* at 15-17. Similarly, the evidence makes clear that although Viarrial purported to invoke his right to remain silent, he almost immediately began to speak to the officers, entirely unprompted. *See id.* at 13-14, 19. Similarly, Defendant, on his own accord, initiated the conversation with Corporal López in which he explained that the heater box in the Lightning Loop residence contained a firearm. Tr. at 30-31. From this decision to engage the officers in conversation, it is apparent that Viarrial elected to abandon

his right to silence and that he did so voluntarily after being apprised of his rights.

Under these circumstances, there is no reason to suppress Defendants' statements.

## CONCLUSION

For the foregoing reasons, the Court will not suppress any of the evidence or statements in this case.

**IT IS THEREFORE ORDERED** that Defendant Gerald Viarrial's Motion to Suppress Evidence and Memorandum in Support [Doc. 22] and Motion to Suppress Statements and Evidence and Memorandum in Support (Second Motion) [Doc. 23] are **DENIED.**

Dated this 27th day of October, 2015.

_____

**MARTHA VÁZQUEZ**
UNITED STATES DISTRICT JUDGE